## EX PARTE ABE ROTHSCHILD.

1. HABEAS CORPUS—PRACTICE ON APPEAL.—Under the provisions of the-
Code of this state this court cannot revise the opinion of the court or
judge on incidental questions which arose on the hearing of a *habeas corpus*
case. On appeal to this court the case must be determined exclusively on.
the facts and the law arising upon the record.

2. SAME.—In affirming a judgment refusing bail, neither the facts nor the law
of the case will, ordinarily, be discussed by this court, lest the rights of the
applicant on his final trial might be prejudiced thereby. But note in this-
case circumstantial evidence on which a refusal of bail is affirmed on.
appeal.

HABEAS CORPUS on appeal from a judgment in chambers,.
rendered by the Hon. B. T. ESTES, Judge of the Fifth Judicial
District.

At the spring term, 1877, of the district court of Marion
county, the grand jury presented an indictment against Abe
Rothschild charging that, on January 21, 1877, with a
pistol, and of his express malice aforethought, he killed and
murdered a " certain white woman whose christian and sur-
name is to the grand jurors aforesaid unknown, but whom
the grand jurors aforesaid do name and call Bessie Moore,.
*alias* Bessie Rothschild, *alias* Diamond Bessie."

Being in custody under the charge thus preferred against
him, the defendant, on August 1, 1877, applied by *habeas
corpus* to the Hon. B. T. Estes, district judge, for the priv-
ilege of bail. Upon the hearing of the application, bail
was refused, and from this adjudication the present appeal
was taken. The record brings up nearly 150 folios of tes-
timony.

The facts of the case suffice of themselves to impress
upon it a remarkable character, and have elicited a wide-
spread interest of unusual intensity. With such a case in
hand, it is safe to predict that the eminent counsel engaged

in it will not fail to make it a prominent land-mark in the judicial annals of the country.

Though now presented to this court in a preliminary form only, by appeal from a refusal of bail, and though this court, in conformity with its well-settled practice, abstains from a discussion of questions which might affect the ultimate trial, yet the decision now rendered is one of great importance in its bearings upon the difficult inquiry as to what state of circumstantial proof suffices, on appeal, to sustain a judgment refusing bail in a capital case.

Sarah King, a colored resident of the city of Jefferson, in Marion county, was gathering fuel in the woods adjacent to the city, late in the afternoon of February 5, 1877, when she found the corpse of a woman. She described it as lying straight on its back, with the left hand across the body. The face, eyes, and especially the nose, according to the witness, were covered with bugs. It was dressed like a lady, and was found in the woods, about 200 yards from the public road leading to Marshall. Witness made no stay at the body, and forthwith sent information of her discovery to Judge Bickford, in Jefferson, who was a justice of the peace and coroner. He summoned a jury and resorted to the spot where the body was found, and commenced an inquest by examining Sarah King. Night approaching, he adjourned the inquest until the next morning, and ordered the removal of the body to the city. A beer-bottle, still containing a small quantity of some kind of liquid, was the only article discovered near the corpse by the coroner. He observed no signs of decomposition except around a wound in the left temple, just at the edge of the hair, which was infested with maggots. The bowels appeared to be swollen. He observed some of the clothing on the body, and identified certain clothing exhibited in court as the same.

A. J. Stambaugh, a constable, was present with the coro-

36

ner at the place where the corpse was found. When he first saw the body it looked to him as natural as life, except that there were wood-bugs on the face and about the eyes, but on a close examination he observed that the finger-nails had turned purple, and that the body seemed somewhat swollen. About thirty feet from it he found, on or near an oak log, a beer-bottle, a cork that looked like that of a pickle-bottle, and some ordinary brown wrapping-paper, on which were light-bread crumbs, chicken-bones, and fragments of pickles. This witness recognized the body to be that of a lady whom he had met on the street some two weeks previous. She was alone when he met her, and was a stranger to him, but attracted his attention by the style of her dress. He saw her but once in life.

This witness had the corpse removed to the coroner's office in town, where it remained that night and the next day and night, and until the succeeding evening, when it was buried in the city cemetery. He recapitulated the articles of dress found upon the body, and identified some of those shown in court. A pair of garters found upon it were delivered by him, with the other clothing, to the coroner, but were not among the articles exhibited to him in court, and he could not say what had become of them. He could not tell of what material they were made, but believed they were blue and white, and fastened with patent metallic buckles. (The coroner did not remember seeing or receiving the garters—articles which subsequently cut some figure in the case.)

Dr. J. G. Eason was present with the coroner at the body in the woods, and appears to have minutely noted the appearances. According to his testimony the body seemed to have been carefully laid out. The hat or bonnet was set on the left side of the head, so as to cover the wound and the left eye. There were black bugs around the wound and the eyes and nose. There was some sign of powder-burn

around the wound and on the edge of the bonnet. He probed the wound and found the range of the bullet to be downwards and backwards to its lodgment in the bone near the opposite ear. Thought the wound must have caused instant death; examined the body for other injuries, but found none. The spot where it lay was very secluded—between two roads, but visible from neither, and scarcely reached by the sunshine for two hours in any day of the year. There was not much sign of decomposition, but it had commenced in and around the wound and about the joints. She was a very fat woman. Witness had seen her in life on the streets of Jefferson; once on Saturday, January 20th, and twice the next morning. Each time she was in company with the defendant, Rothschild. When the witness first saw the body in the woods, he did not recognize it as that of the woman he had seen with the defendant, but remembered her to be the same before he got back to his office. Testified at the coroner's inquest that the woman had been dead fifteen days, and still held to that opinion. Within twelve hours after the body was taken to the coroner's office, decomposition progressed rapidly and had become very considerable.

Dr. J. H. Turner was landlord of the Brooks House, in Jefferson, and on January 19, 1877, first saw Rothschild at the railroad depot, in company with a lady. They went with witness in an omnibus to the Brooks House, and there Rothschild registered as "A. Monroe and wife." Thinks Rothschild took his breakfast Sunday morning, the 21st, at the Brooks House, and that he and the lady left the house together about ten or eleven o'clock that morning; and about two or three o'clock in the afternoon witness next saw Rothschild in the parlor of the hotel, but the lady was not with him, and the witness saw no more of her. When Rothschild came into the parlor, witness asked him if he had had dinner, and he said he had, at Kate Wood's, and after-

wards asked witness if that party had returned. Witness asked him what party, and if he meant his wife, to which he replied yes; and witness then asked him where he expected her from, and he said he had gone across the bayou with her to see some friends or relations.

Rothschild stayed about the hotel the next day, Monday, and left by the east-bound train about three o'clock Tuesday morning, which was January 23d. When he and the lady came to the hotel, they brought a trunk and a valise. The trunk was covered with ducking, and was marked "A. Moore, N. O.," on the leather below the handle. Witness next saw Rothschild at Cincinnati, Ohio, whither witness went, for the purpose of identifying him, some time between February 8th and March 1st. When Rothschild left Jefferson on January 23d, he took with him the trunk and luggage which came with him and the lady. Witness had since seen a trunk which looked like the same, but with the duck cover off. This last trunk, however, was marked "Annie Moore, New Orleans," above the handle, but below the handle was a black mark large enough to cover the name.

According to the witness the train by which Rothschild left Jefferson, on the morning of the 23d, was the first through east-bound passenger train since he was last seen in company with the lady on the 21st; but at ten o'clock, A. M., of the 22d a freight train with a caboose passed east.

This witness saw the body of the woman on which the inquest was held about February the 5th or 7th, but did not see enough of the woman who came with Rothschild to enable him to identify the corpse as hers.

Jennie Simpson, chamber-maid at the Brooks House, saw the dead body on which the inquest was held about February 5th, and recognized it as that of a lady whom she had previously seen at the Brooks House. The lady came to the Brooks House with a gentleman whom witness recognized as Rothschild, on Friday evening, and left the Brooks

House about ten or eleven o'clock the next Sunday, which was two weeks before the inquest. Rothschild was up in room No. 4, after they came there, Friday evening The lady seemed very much heart-broken. He and she were fighting most all the evening, after they came there. She would cry so you could hear her on the third floor. When she would cry loud, he would read. Witness asked her how long they had been married. She made no reply, but he spoke up and said they had been married two years. Witness asked her how long they had been traveling, and she said three weeks. Witness asked her if she was traveling for her health; and he spoke and said yes, that she had a spleen in her side. Witness asked them where they were from, and he said from Boston, New York. Witness asked her where were her people, to which she said nothing. He asked witness why the lady did not tell her name. Witness asked her what it was, and he said she was his wife, and asked witness how long she supposed they had been married. Witness supposed about two years, and he said yes, and asked witness how she came to guess so well, and said they had been married about two years. The only jewelry she wore was two diamond rings. The witness described the dress the lady wore when she went off with Rothschild Sunday morning, and saw him soon after he returned by himself in the afternoon, when she went for him to come to dinner, and he said they had been to dinner at Mrs. Wood's. Witness asked him where his wife was, and he said he had left her at Mrs. Wood's, and she would be at home that night. Next morning witness noticed at the breakfast-table that he had on the two rings which the lady had worn on the day she left the house. He wanted no breakfast except a cup of coffee, saying that he had been sick the night before. Witness heard him walking in his room off and on all that (Sunday) night. Monday night witness said to him that his wife had not come yet, and he replied that she would

meet him next morning at the train. He burned a pile of written papers in the fire-place Sunday night.

This witness was shown a lady's hat, cloak, and several other articles of ladies' dress, and identified them as the same which the lady wore off when she left the Brooks House on the 21st, and the same which were on the corpse at the coroner's inquest.

This witness was subjected to a very rigorous cross-examination, in the course of which she said that she did not see the rings on Rothschild's fingers at the breakfast-table Monday morning, but when he was lying on the sofa in the parlor the previous evening.

W. A. Walker saw Rothschild and a lady with him, on the accommodation train from Marshall to Jefferson, on January 19, 1877. Witness was with them on the train an hour and a-quarter at least, and noticed them pretty closely, thinking at first that she was a friend or a relative. He observed two unusually fine diamond rings on the lady's fingers, and thought she also wore a large plain gold ring. He took one of the diamond rings to be a very fine solitaire. The stone in one of the rings was particularly large, and may have had small stones around it. Witness saw the corpse at the coroner's inquest, and recognized it as that of the woman he saw with Rothschild.

Frank Malloy saw the corpse at the inquest, and recognized it as that of a woman he had seen about two weeks previously at Mrs. Wood's restaurant. Witness' attention was attracted to the woman by her drinking beer and seeming to be intoxicated. She was in company with a gentleman, and witness identifies Rothschild as him. Witness was at the restaurant between nine and eleven o'clock, A. M., and the day was Sunday. He went out and they came out after him, and followed down the street in company with each other. They went from the restaurant down Austin street to Gill's corner, and turned to the right towards.

Polk street bridge, which crosses the bayou just above the steamboat-landing. Witness saw Rothschild go on the bridge, and crossing from the city to the other side, and thinks that he and the lady each carried a bottle of beer, and he also a package done up in a newspaper. He noticed two rings on the lady's fingers, and took one to be a cluster and the other a solitaire, both of very good size.

Two or three hours after seeing the defendant and his companion crossing the bridge, this witness saw a gentleman coming from the bridge, by himself, and took him to be the defendant. Did not see the lady again in life; but identified the cloak and dress worn by her at the restaurant as the same he saw on the corpse at the inquest.

D. P. McMullen saw Rothschild on Sunday, January 21, 1877; met him on Austin street, going towards Polk street. He was walking in company with a lady, and as witness came close to them the lady passed to Rothschild a package which looked like a beer-bottle wrapped in brown paper, and requested him to carry it. Witness heard no other remark passed between them. Witness saw the body of the same lady, two or three weeks afterwards, at the coroner's inquest.

H. J. Donovan was baggage-master of the Texas & Pacific Railroad, at Jefferson, and on January 19, 1877, saw Rothschild getting off the train with a lady. They had a large sole-leather trunk, which witness took from the train, and on which he noticed the name "Annie Moore," on the upper part, under the covering. Witness saw Rothschild and the same trunk on Tuesday morning, and checked the trunk to Little Rock for him. A trunk being shown to the witness, he recognized it as the same trunk, but without the cover.

C. H. Pepper kept the Capitol Hotel in Marshall, Harrison county, Texas, in January, 1877, and recognized Roth-

schild as a man who came to his hotel on the 17th of that month, bringing with him a lady who passed as his wife. On his hotel register, under date of January 17th, the defendant wrote " A. Rothschild and wife, Cin'ti, O." They stayed at the hotel one or two days; not over two days.

S. A. Spellings was keeping a livery-stable in Jefferson, on Saturday, January 20, 1877, and on the evening of that day Rothschild came into his stable and asked if he could get a horse and buggy the next morning. Witness told him to come around, and probably he could get it. The next morning, about eleven o'clock, he came back and asked if he could get that buggy. Witness told him he could by giving a reference, which he said he could not do. Witness asked him if he could put up collateral, and he proposed to put up $20, which witness told him was not enough. Witness asked him where he wanted to go, and he said he wanted to take a lady around town. Witness asked him who the lady was, and he answered that he guessed witness did not know her, and that she was at Kate Wood's. Finding that he could not get the buggy, Rothschild remarked, "I guess, then, that we can walk," and walked off down Polk street.

John Neff was coming into town about eleven o'clock on January 21, 1877, when, at the end of the bridge across the bayou, he met Rothschild and a lady going in the opposite direction. Afterwards, late in the afternoon of the same day, Rothschild, Dimmick, and two strangers (drummers) were at witness' saloon in Jefferson. They left the saloon about supper-time, and about an hour, or perhaps two hours, afterwards Rothschild returned to the saloon, and remained there till midnight or afterwards.

Kate Wood kept a restaurant in Jefferson in January and February, 1877, and saw the dead woman who was found. She thought she had seen, in her restaurant, a lady very

much like the deceased ; but her recollection of dates and persons was indefinite, and her testimony casts no new light on the case.

Miss Isabella Gouldy, the most important witness for Rothschild, had resided at or near Jefferson nine years, and remembered the finding of the corpse of a lady in February, 1877. She saw the body, and, with the assistance of Miss Mollie Turk, made its burial clothes, and they, aided by four colored women, undressed and dressed the body. The witness took off the shoes, stockings, and garters of the deceased. One of the garters, being too large, was lapped over and fastened with a pin.

This witness testified that on a Saturday she saw, in life, on Vale street, in Jefferson, the same lady whose body was afterwards found. The lady was then in company with a gentleman who looked like Rothschild, and was dressed in the same clothes found on her body. And on the next Thursday after the Saturday spoken of witness was in town again, and about five o'clock in the evening, as she was going home, she saw a lady dressed like the same lady, and in company with a gentleman who was not Rothschild. Witness saw these parties at a point in the road, across the bayou, about 250 yards from the bridge. Witness passed them and recognized the lady as the same she had seen on Vale street with Rothschild the previous Saturday ; and after passing them witness turned and looked at them, and saw the lady stooping down as though she was pinning her garter or fixing something. The man who was with her was a light-complexioned man, with a cap on, and a stranger to witness. He was a medium-sized man, without whiskers, and wore black clothes and no overcoat. Witness had never seen him before or since. The lady wore no veil or gloves. While Miss Mollie Turk and witness were dressing the body on Tuesday night, witness told Miss Mollie she had seen the lady on the Thursday week

previous; and witness also spoke of it to Mr. Armistead, and to her brother Charles. It was about a week after the body was found, and was before Rothschild was brought back to Jefferson, that witness told Armistead about seeing the lady on the Thursday spoken of. Witness lives with her father, across the bayou from Jefferson, and about a mile from the business part of town. Besides her father, her family consists of two brothers and three sisters, all younger than herself; to none of whom, except her brother Charles, had she mentioned seeing the lady on the Thursday in question.

The witness declined to answer whether she ever stayed at a house of prostitution in the town of Marshall, and sundry other questions respecting her associations and former mode of life. She said, however, that nearly two years ago she went home the day before her mother died, and promised her mother to live at home, and take care of the children, and try to do right, and since then she had lived at home with her father; that she had been unfortunate and foolish when she was young.

Charles T. Gouldy, the brother of Isabella, stated that she told him about the finding of a dead woman, but he did not remember that she ever told him she had seen the woman alive.

W. T. Armistead testified that Belle Gouldy told him, about a week after the body was found, that she had seen the woman twice before she saw her dead body; the first time, passing down Vale street, on Saturday, January 20th, in company with a gentleman; and the second time, on the Thursday week before the body was found; that she then saw her about 250 yards beyond the bridge, on the road leading to Gouldy's house, accompanied by a different gentleman than the one who was with her on Vale street.

W. J. Ferguson, jailor of Marion county, stated that Isabella Gouldy had once visited Rothschild in his cell in

the jail, some three or four days after he was put there. Witness was present and heard all the conversation between her and Rothschild. Other ladies and many persons had visited Rothschild in jail shortly after he was put there.

Proof respecting the associations and the recent habits of Miss Isabella Gouldy was offered by the prosecution, but was disallowed on objection by the applicant.

There were no rings found on the body, according to the evidence. Distances are not distinctly disclosed, except that the spot where the body was found was 1,300 yards from the nearest end of the bridge. An immense amount of testimony was taken as to the weather and the temperature at Jefferson from January 21st until February 5th, and of medical testimony as to the effect of such weather and temperature in promoting or retarding decomposition. An abstract was introduced, taken from the register of the United States signal officer at Shreveport, Louisiana, about fifty miles east, and ten or fifteen south, of Jefferson. It showed a mean temperature of 51 degrees, 7 minutes, between the dates in question, the *maximum* being 72 degrees on February 1st, and the *minimum* 32 degrees on January 24th. It showed, also, that rain fell at Shreveport on January 25th, and on February 2d and 3d. Many witnesses were interrogated as to the weather and temperature at Jefferson, but their accounts of it were not very distinct or consistent.

Eight physicians were examined—some of them at great length—upon climatical influences upon dead bodies in respect of decomposition, and upon the possibility or probability that a body would exhibit no more indications of decomposition, fifteen days after death, than did the body of the deceased. The doctors agreed very well upon the theoretical question, but differed considerably on the practical one. The deduction drawn from their evidence by the district judge was that it was possible, but not probable, that

the body would exhibit so little sign of decomposition fifteen days after the extinction of life. In view of all the evidence, however, he refused bail, and the applicant appealed.

The case was argued orally in this court, and briefs filed of remarkable ability, for the applicant and for the state. The necessity for curtailing the briefs is regretted.

*Mabry, McKay & Culberson, Culberson & Armistead*, and *Crawford & Crawford*, for the appellant: The rules which ought to guide this court in the consideration of this record, and the law which must control its judgment, are believed to be well settled.

What offenses are bailable? The Bill of Rights provides that "all prisoners shall be bailable by sufficient sureties, unless for capital cases when the proof is evident." See Const., Bill of Rights, sec. 11.

The language used imports a perfect knowledge, upon the part of the framers of the Constitution, of the adjudications upon similar provisions, as well as careful consideration of the scope and meaning of the words used to form and cover the exception provided for. There is no redundancy of words employed, and all useless and synonymous phrases or expressions, carrying the same degree of certainty or meaning, are ignored.

The Constitution of 1845 provides: "All prisoners shall be bailable upon sufficient sureties, except in capital cases when the proof is evident or presumption great." In the case of *McCoy* v. *The State*, 25 Texas, 38, the court say "the terms 'proof is evident or presumption great' are as evident to the legal mind as any words of explanation could make them, and are intended to indicate the same degree of certainty, whether the testimony be direct or circumstantial. The design is to secure the right of bail in all cases, except in those in which the facts might show with reasonable certainty that the prisoner is guilty of a capital offense."

The concluding sentence in the opinion of the court is as follows : "We are of opinion that the facts, as presented in the record in this case, do not show with reasonable certainty that the prisoner is guilty of murder with express malice, and that therefore he is entitled to bail." It appears from this decision that the term "or presumption great" performed no office in the Bill of Rights in the Constitution of 1845, and, therefore, was superfluous ; and it is equally clear from this opinion that "proof is evident" means such evidence as satisfies the mind with reasonable certainty of the existence of a fact. It becomes important to inquire what meaning the court intended to impart to the term "reasonably certain." What did the court intend by the use of that term?

When we say a fact is certain, or certainly proven, we mean that it is no longer to be doubted or denied—it is established unquestionably and surely. In what degree is the meaning of the word "certain" to be qualified by the use of the adverb "reasonably?" Was it intended by the use of this prefix to lessen or abridge the meaning of the word to be qualified? We think not; but, on the contrary, believe that the plain import and meaning of the term "reasonably certain," as used by the court in the case of McCoy, is certain consistent with reason upon all the facts and circumstances proven in the case. The guilt of the appellant must appear from the testimony to be certain, and such certainty must not conflict with reason. It must not only be certain, but reasonably certain. This construction preserves the vitality of the constitutional provision in respect to bail, and does not remit it to the indefinite character of evidence contended for by the counsel for the state. And, besides, it supports the decision in the case of *Ex parte Miller*, 41 Texas, 214.

In the case of Miller the court say that the true question to be decided upon the record was, Does it evidently appear

that the applicant was guilty of murder in the first degree? The same question was presented in this case. In the former case the applicant based his right to bail upon the ground that the evidence did not show, with reasonable certainty, that he was sane at the time of the killing. There was a conflict in the testimony on that point, and the fact in issue—namely, the guilt of the applicant—was, in conse-. quence of such conflict, left uncertain—not evident. The fact of guilt of murder in the first degree could not be ascertained except by and through the process which the law prescribes for the guidance of juries.

In this case the applicant rested his right to bail upon the ground, among others, that the proof did not show with reasonable certainty that he was the guilty agent. The evidence was circumstantial on the part of the state. There was a serious conflict in the evidence relied upon by the state to show the guilt of the applicant, and that produced and relied upon by the applicant to exculpate himself. It was upon a material point. The evidence for the state, solely circumstantial, was assailed by circumstantial and positive evidence in behalf of the prisoner. The evidence for applicant was unimpeached, and the circumstances relied upon were of equal dignity to those opposed, and, in the mind of the judge, preponderated in his favor. What was this material point of conflict? The evidence relied upon to show guilt substantially disclosed that the relator, Rothschild, came to Jefferson in company with the deceased, whom he recognized as his wife, on January 19, 1877. They remained in the city until Sunday, the 21st. On that day, about eleven o'clock, they were seen crossing the bridge over the bayou, going towards the woods and fields south of the city. Applicant returned alone; remained in the town until Tuesday, the 23d, when he left on the north-bound train. The court will see, from the inspection of the record, that the whereabouts of the prisoner was accounted

for from the time he returned to the city Sunday evening until he left on Tuesday. The proof shows certainly that the prisoner was never seen in Jefferson from that day until he returned in arrest. If he killed the deceased, it must have been done on Sunday, the 21st, between the hours of eleven A. M. and one P. M. The state held to that theory, because if any other theory was admitted the innocence of the applicant would stand confessed. The prosecution introduced evidence to show that the body had been dead fifteen days, in order to couple the defendant with the killing. The applicant offered proof, of equal credibility in every respect, to disprove that assumption. This point, therefore, was material. Ordinarily the time of death is not material; but in this case it became, and was, material, because the state proved the absence of defendant from the town from the 23d until his arrest, and it accounted for him from one o'clock, P. M., on Sunday, 21st, until Tuesday morning, and it therefore became necessary to show that the killing took place on Sunday, in order to show an opportunity for the defendant to have been the guilty agent.

One witness swore that she had seen the dead woman alone in the city on Thursday, after Rothschild left on Tuesday before. If this witness is to be believed, the applicant cannot be guilty. This witness had better opportunity to know what she deposed to than any witness who testified as to identity. There was a circumstance or two strongly corroborative of the truth of her statement. When she saw the woman in life on Thursday, after the date when Rothschild left, she noticed her adjusting a garter, as if pinning it. When the witness was undressing the body, preparatory for burial, she observed that one of the garters was lapped and fastened with a pin. No effort was made to impeach her general character for truth. Her statement does not conflict with that of any witness who testified in

the case, but is a complete answer to the conclusions sought. to be established by the state.

We say that the law points out the mode by which a witness may be discredited, and no case can be found where judge or jury have been permitted to arbitrarily reject the testimony of a witness under such circumstances as here presented. Here there was a statement verified by an unimpeached witness, supported by attending material circumstances, which, if true, overthrew the inference that Rothschild was the guilty agent because last seen with the woman, and yet we are gravely told that there was no conflict on a material point. The evidence on this point of conflict did not stop with this witness. The evidence of the physicians clearly shows that a body exposed as that of the deceased, for fifteen days, would have developed and shown more decomposition than this body exhibited when found. It was within the range of *possibility* for this body to have remained on the spot where found, for fifteen days, and exhibited no more signs of decay, but it was not probable. All the probabilities, the laws of decay, the sworn statement of a witness, the law's presumption of innocence, were all in his favor, and opposed to bare presumption of guilt, supported by an exception to the laws of nature, a freak, a mere bald possibility ; and yet we are told that the defendant is not entitled to bail. It is not enough in this state, to insure bail, to overthrow a presumption by positive testimony, to destroy a possible state of decay by the general laws of nature, to produce a line of argument totally in conflict—at war—with the evidence produced by the state, and of equal dignity, consistency, and credibility ; but we are required to prove in addition to all this an *alibi* covering the entire period. To this result flows the reasoning of the state, which is approved by the judge, as we understand his opinion.

Where guilt is sought to be shown from circumstances grouped or coupled together, each independent fact or circumstance which constitutes the chain of evidence must be proven with the same degree of certainty as the main fact in issue. A fact or circumstance so proven will support a presumption or inference, more or less conclusive, according to the nature of the fact or circumstance proven.

A presumption thus made will not support an inference or another presumption. When all the facts and circumstances are proven, and the inferences which the circumstances will bear are reduced to a line or chain of testimony, it must be of such consistency, strength, and nature as to exclude with reasonable certainty any other hypothesis but ·that of the guilt of the defendant. · It was contended, on the hearing, that the rule of law as recognized in this state was correctly laid down in the case of *Shultz* v. *The State*, 13 Texas, 406. We insist the rule is as we have stated, and on this point we refer to the following cases : *Roseborough* v. *The State*, 43 Texas, 575 ; *Black* v. *The State*,. 1 Texas Ct. of App. 368 ; Burr. on Cir. Ev. 737, 738 ; Wills on Cir. Ev. 149 ; 1 Stark. 575.

· "The *onus* of proving everything essential to the establishment of the charge against the accused lies on the prosecutor." Burr. on Cir. Ev. 723.

The evidentiary facts must all be proved, and the existence of none of them can be presumed. Burr. on Cir. Ev. 733 ; see, also, rules 2 and 3, p. 735, and rule 1, p. 737.

In a case like the one at bar, every material, substantive allegation in the bill of indictment, and which are necessary to constitute the crime as charged, must be proved by the state ; and each and all must be proved clearly, manifestly, evidently, before the accused can be denied bail. The substantive facts are as follows, viz. : 1st, the *corpus delicti*, or that there was a killing ; 2d, that ·the accused

was the guilty agent; and, 3d, that the killing was done with express malice. The fact that the proof of the first two propositions is essential will not be denied. From the opinion as rendered in the court below we are led to conclude that the court assumed that express malice may be presumed or implied. We insist that when malice is implied the offense becomes, and is, murder in the second degree. Because, we say, that the law of this state defines the two degrees of murder as follows:

" Every person with a sound memory and discretion, who shall unlawfully kill any reasonable creature in being within this state, with malice aforethought, either express or implied, shall be deemed guilty of murder.

" All murder committed by poison, starving, torture, or with express malice, or committed in the perpetration of robbery, etc., is murder in the first degree; and all murder not of the first degree is murder of the second degree." Pasc. Dig., sec. 2267.

Murder of the first degree is a capital offense, and murder of the second degree is not.

Then we insist that, in a case where the court must imply malice, this at once makes the case murder in the second degree, and therefore bailable. Our supreme court, in the case of *Farrer* v. *The State*, 41 Texas, 272, in discussing the distinction between implied and express malice, say: " But while the law implies malice on proof of voluntary homicide, it does not 'impute express malice. This is an inference not of law, but a question of fact, consisting in intention dependent upon the state of the mind. And, to warrant a conviction of murder in the first degree, it must be proved, like any other fact in the case, by such evidence as is reasonably sufficient to satisfy the jury of its existence."

The imperative necessity of the proof of each of the substantive facts is fully discussed in the cases of *Roseborough*

v. *The State,* 43 Texas, 574; *Barnes* v. *The State,* 41 Texas, 342. See, also, note *o,* 1 Stark. on Ev. 560; *Black* v. *The State,* 1 Texas Ct. of App. 381.

It is not the policy of the law to incarcerate men charged with crime; for the constitution declares that all prisoners shall be admitted to bail on sufficient security, "except in capital cases where the proof is evident." The admission of a prisoner to bail is not an acquittal, for he is still in the custody of the law. And we submit that no case can be found in this state where a judgment and conviction has been sustained on proof as weak and inconsistent with guilt as the one at bar.

How strongly, then, does this case commend itself to the court for its action favorable to the accused.

*George McCormick,* Assistant Attorney General, for the State. Where the facts show with reasonable certainty that a murder with express malice has been committed, bail should be refused. *McCoy* v. *The State,* 25 Texas, 33; *Drury* v. *The State,* 25 Texas, 45; *Sharp* v. *The State,* 1 Texas Ct. of App. 299.

This being the rule in this state, the next question arises upon the evidence, and this question must suggest itself: Would the verdict of a jury, finding the prisoner guilty of murder with express malice, upon the evidence in this case, be sustained by the court?

If it would, then we respectfully insist that the opinion of the judge who heard the evidence in this case, and who refused the prisoner bail after seeing the witnesses and noting their manner upon the stand, should be entitled to the same weight and respect as that of the jury; and this court, having nothing before them but the cold pages of the record, will not revise the opinion of the judge unless, in their opinion, it is not supported by the proof, and is clearly erroneous.

Again, if it be the admitted rule that this court will not disturb a verdict when there is sufficient proof to warrant it, notwithstanding it is conflicting, how much more reason- ably should the rule prevail in a case where the effect of the judge's opinion of the evidence is simply to refuse bail?

Can it be reasonably insisted that the proof must be more conclusive to deprive a citizen of liberty for the time being; only, and until his case can be investigated further, than to take life? In other words, was it the intention of the law- givers to require more conclusive evidence in the one case than in the other?

We are told it is a safe rule, where a malicious homicide is charged, to refuse bail in all cases where a judge would. sustain a capital conviction, if pronounced by a jury, on such evidence of guilt as was exhibited to him on the hear- ing of the application to admit to bail. Hurd on Hab. Corp. 438.

The evidence in the case at bar proves murder in the first degree, and that the prisoner is the guilty agent. It shows:

1st. The *corpus delicti*, and the identity of the body of the deceased.

2d. The prisoner is identified as the person last seen with her.

3d. That the prisoner and deceased came to Jefferson from Marshall in company with each other, on January 19, 1877.

4th. When the prisoner and the deceased are *en route* from Marshall they are particularly noticed. The woman wears upon her hand two large diamond rings, one a soli- taire, with the jewel nearly as large as a five-cent coin, the other a cluster, and both very valuable. She was richly and fashionably dressed, and attracted universal attention.

5th. When the prisoner and deceased arrived at Jeffer- son he registers at the hotel under an assumed name, and states that the woman is his wife.

6th. While at the hotel they are heard to dispute and quarrel; they occupy the same room, and acknowledge themselves husband and wife.

7th. The next day after their arrival the prisoner, while the weather is cold, rainy, and disagreeable, attempts to hire a buggy to take a lady out to ride. This is January 20th.

8th. On January 21st, at ten o'clock, A. M., the prisoner goes with the deceased from the hotel to Kate Wood's restaurant, and again attempts to hire the buggy, but fails, and remarks they will walk.

9th. These parties are seen at Kate Wood's, drinking beer together; the deceased has the diamond rings on her hand, and seems to be drunk. This is soon after they leave the hotel. Notice here the fact that the prisoner takes his wife to a public house and plies her with drink in the presence of strangers.

10th. The prisoner and the deceased are next seen to leave Kate Wood's (about eleven o'clock, A. M., January 21st), and walk in the direction of the bridge over the bayou. He carries a paper package under his arm, and a bottle wrapped in paper in his hand. She carries a bottle wrapped in paper.

11th. They walk in the direction of the bridge. Further on the way they are met by another witness, who hears the deceased ask the prisoner to take her package, and who sees him take it, and watches them walk together to the bridge. This witness also notices the packages particularly.

12th. The bridge is in the direction they would necessarily travel to reach the spot where the body is afterwards found, and some 1,300 yards distant.

13th. About one o'clock, P. M., of the same day, the prisoner returns to his hotel alone, having left his wife—somewhere.

14th. Upon his return to the hotel he states that he left his wife over the bayou with her friends. Again, he says he

left her at Kate Wood's, and, again, that she will meet him at the train.

15th. The prisoner leaves the state on the first through train, taking with him all the baggage he and his wife carried to Jefferson, leaving her no clothes or baggage, and in a strange city, among strangers, and without friends.

16th. The prisoner is seen in possession of the deceased's diamond rings when he returns to the hotel.

17th. The body of the woman is found, just fifteen days after the prisoner had been seen with her going in that direction, over the bayou in a secluded spot. He is the last person seen with her.

18th. The place where the body is found is over the bayou from the hotel in Jefferson, and the prisoner, after taking his wife from the hotel, on his return said he had left her over the bayou with her friends, showing he had been over the bayou with her.

19th. It is shown upon the *post-mortem* examination that death was the result of a pistol-shot wound inflicted upon the left side of the head, and that the wound was not the result of accident or suicide.

20th. The body, when found, was clothed in the same garments that the deceased wore when last seen in life, with the prisoner, just fifteen days before, and the physician who saw her then, and who afterwards made the *post-mortem* examination, declared " she had been dead fifteen days."

21st. The other facts and circumstances show that the woman when found had been dead fifteen days. They are :

(1.) The opinion of the medical experts who examined the body.

(2.) The temperature of the weather during those days.

(3.) The secluded spot where the body lay, hidden as it was from the sun, and exposed to the cold of an extraordinary winter, being preserved, as one of the counsel expresses it, " in a natural *refrigerator*."

(4.) No living witness, worthy of belief, can be produced who ever saw the woman alive after twelve o'clock, M., January 21st.

(5.) The two beer-bottles and the brown paper, and remains of the snack, seen by the witnesses in the hands of the prisoner when he and deceased were going in that direction, January 21st, are found near the dead body. This fact also shows the presence of the prisoner at the place of the murder, and is conclusive as to the time when he was there.

(6.) The body, when found, is dressed exactly as the woman was when last seen, fifteen days before.

In further support of the fact that the prisoner murdered his wife, we submit:

1st. His statements made to the witnesses at the hotel. He said he left her over the bayou with her friends. What friends?

2d. He made no inquiries after his wife when she failed to return; did not search for her. She had no friends over the bayou with whom to leave her.

3d. Who were the friends with whom he left her? Where do they live? At what house did they then reside?

4th. He left her no baggage or change of linen, and can now give no account of her whereabouts.

5th. If he left her over the bayou with friends, she would have been seen by some one since, and frequently; and he could give the names of the friends, or the description of the place where he left her.

It is further submitted that if the prisoner deserted his wife in that strange city, carrying off her clothes, that she would have been heard to complain; the place where he left her could be shown; the names of the persons with whom she was left could be given.

And, further, if the deceased remained in Jefferson alive, after the prisoner left her over the bayou, we ask:

1st. Where did she stay?

2d. Who gave her food and shelter?

3d. Who saw her alive during all those dark, stormy, and wintry days between January 21st and February 5th.

But it is insisted for the prisoner that he is not required to say anything; that he can stand mute and silent, panoplied in the shield of presumptive innocence; that he is not required to show a defense, and, therefore, nothing is to be presumed from his silence.

If this be so, why does he introduce any testimony whatever? He does speak when he introduces Belle Gouldy, and the testimony attempting to show the improbabilities attending the preservation of the body, and we must presume that he has made the best defense within his power.

Can it be said that the prisoner prefers to remain silent, and not account for the circumstances against him? His efforts in this case to get bail contradicts this theory.

Then why not, when the proof is so easily made (if it be a fact), show a single fact or circumstance contradicting the evidence against him?—say where he left the murdered woman on that fatal Sunday when they crossed the bayou together. This would open his prison-cell at once. Burr. on Cir. Ev. 511.

We insist that, under the facts shown in this case, the prisoner must account for the circumstances against him, or his guilt stands confessed. *Campbell* v. *The State*, 23 Ala. 44; *Com.* v. *Webster*, 5 Cush. 295; *The People* v. *McWhorter*, 4 Barb. 438.

In reply to this self-evident proposition the prisoner rests his defense upon two propositions. They are:

1st. That the body of the deceased would not, in all probability, have remained fifteen days after death without showing more signs of decomposition.

2d. The witness Belle Gouldy, to show that the woman was alive four days after the prisoner left her over the bayou.

To this defense we submit:

1st. All the facts introduced by the state show that the woman was murdered fifteen days before the body was found.

2d. The evidence shows that it is not only possible, but probable, that a human body, situated and under the circumstances this was, would remain in the condition in which this was found for fifteen days.

Now, upon this point we submit that the state has shown all that can be proven upon this subject. If there is other evidence, it is clearly within the possession of the prisoner. If the body could not have remained so long, he must show that fact.

Counsel for the prisoner, in their able brief, use the following language : "It was within the range of *possibility* for this body to have remained on the spot where found, for fifteen days, and exhibited no more signs of decomposition."

Then, if this be true (and it is admitted), this, taken in connection with the other facts of the case, is sufficient ; for the evidence of the state fully complies with the rule of law requiring the *best evidence of which the case in its nature is susceptible.*

The question as to the time in which a body will remain after death without decomposing is an unsettled one, dependent upon many contingencies. It is one that cannot be definitely settled, and the evidence of the state is as certain and conclusive as any evidence can be. An examination of the authorities on this interesting subject will show that it is impossible for experts to say with certainty, from the appearance of the body, at what time death ensued.

"Orfila, after having devoted many years to the investigation of this subject, and after the comparative examination of some hundreds of exhumed bodies of all ages and of both sexes, came to the conclusion *that it was beyond the reach of science to determine with accuracy the period of death from the progress of putrefaction.*" 1 Taylor's Med. Jur., 2d ed., ch. 7, p. 110.

As to the testimony of the witness Belle Gouldy, to this we submit :

1st. This witness is flatly contradicted by all the facts shown in the case.

2d. She had no better opportunities for seeing the woman than hundreds of others who must in the very nature of things have seen her if she had been alive.

3d. Her story is so improbable of itself, and so entirely unsupported by any other fact, that it is unworthy of belief.

4th. She was not believed by the judge who heard her testify, who saw her upon the witness stand, and who had opportunities to weigh and investigate her means of information and the truth of her statements.

Again, it is insisted by counsel that, although the prisoner may be guilty of the crime of murder, yet that the state has failed to prove him guilty with *express malice.*

If this proposition needed a reply, it would be sufficient to point to what we have already shown. But take the external circumstances surrounding the case, and they discover that inward intention of the prisoner. His deliberate compassings, the nature and character of the act done, the deliberation shown in preparing for the deed, the state and condition of his mind at the time—all these show express malice. *Singleton* v. *The State*, 1 Texas Ct. of App. 507; *McCoy* v. *The State*, 25 Texas, 33; *Farrer* v. *The State*, 42 Texas, 265.

The rights of the state, of the community, of society, are all placed in the care of the court, and the responsibility and duty of protecting these interests are as imperative as that of insuring to the prisoner the rights which the law guarantees to him.

*E. Guthridge, T. J. Campbell, G. T. & C. S. Todd,* of counsel for the State, argued the cause orally.

White, J. This case is an appeal from a judgment on a

writ of *habeas corpus*, rendered in chambers by the Hon. B. T. Estes, judge of the 5th judicial district of the state, to whom the applicant, who is under indictment for murder in Marion county, made application for bail.   Bail was refused, and this appeal taken.

Under the provisions of our Code this court cannot revise the opinion of the court or judge on incidental questions arising on the hearing of the application for *habeas corpus*. The case upon appeal must be heard and determined alone on the facts and the law arising upon the record.   Pasc. Dig., Arts. 3221, 3222.

Where it becomes necessary, upon appeal in such cases, to affirm the judgment refusing bail, the practice has been uniform, and is well settled by the decisions of the supreme court and of this court since its organization.   The rule is that neither the facts nor the questions of law presented in the record will ordinarily be discussed, lest, perchance, the rights of the applicant might be thereby prejudiced on his final trial.   We have, however, examined with great care the very many interesting questions of law and fact presented in this record, and so ably discussed in the oral arguments and briefs of both the counsel for the applicant and the state ; and this court will avail itself of the first suitable case, where a reversal of a judgment refusing bail in a capital case becomes necessary, to discuss the meaning, as understood by us, of that provision of the Bill of Rights which declares that " all prisoners shall be bailable by sufficient sureties, unless for capital cases where the proof is evident " (Bill of Rights, Art. 1, sec. 11, Const.), and, in connection therewith, review the leading authorities, with a view of declaring the true rules which regulate and govern the action of this court in its adjudications upon such cases.

So far as the case under consideration is concerned, we deem it sufficient to say that, in accordance with our opinion of the law when applied to the facts contained in the record,

the court below did. not err in refusing bail to the appli-
cant.

The able counsel on both sides of the case have reflected
honor and credit upon themselves and their profession by
the force of their arguments and the ability of their briefs.

The judgment of the district judge of the 5th district, in
refusing bail to applicant, is affirmed.

*Affirmed.*